STATE OF MAINE
PENOBSCOT, SS.

SUPERIOR COURT
CIVIL ACTION
Docket No. CV-01-203

FILED & ENTERED
SUPERIOR COURT

JUL 1 5 2003

PENOBSCOT COUNTY

Robert Winslow,
        Plaintiff

        v.

Decision and Judgment

DONALD L. GARBRECHT
LAW LIBRARY

AUG 5 2003

Hartt Transportation Systems, Inc.,
        Defendant


        Hearing in this matter was held on June 30, 2003. The plaintiff appeared with

counsel, and counsel for the defendant was present. For a portion of the trial, a

representative of the defendant was present. At the close of the trial, the parties agreed to

leave the record open to allow the filing of a deposition transcript in lieu of live

testimony, which the parties have done.[1] The court has reviewed that and the other

transcripts that were made part of the record, as well as the remaining evidence in the

case.

---

[1] The court has read those transcripts. The parties press all objections that they made on
the record in those proceedings. As to Officer Buckley's deposition, the defendant's
objections on pages 6 and 7 are sustained. The remaining objection on page 8 is
overruled to the extent that is seeks information that would be commonly understood.
        As to Dr. Lawsing's deposition, all objections are overruled. In particular, the
court overrules the objection on page 30, which is based on discovery issues, for two
reasons. First, on cross-examination, the defendant made inquiry into the issue that was
the subject of his objection on redirect. It appears that the defendant explored that area
after having seen the records that the plaintiff then used as a basis for his follow-up
questions. Additionally, Dr. Lawsing's opinion on causation flowed not only from his
review of the records but on his own independent findings. (T. 31.)
        Finally, as to Dr. Weitman's deposition, all objections are overruled.

1

During the daytime hours of September 15, 2001, the plaintiff was driving his motorcycle on Outer Hammond Street in Bangor. The weather was fair and dry. He was familiar with the operation and handling of the motorcycle, and he was driving within the posted speed limit. At an intersection that the plaintiff was approaching, Kevin White was driving a loaded tractor-trailer. White was an employee of the defendant, and the parties do not dispute here that the defendant is vicariously liable for any negligence attributable to him. White was stationary at that intersection of Outer Hammond Street and Hildreth Street, waiting at a flashing red light and stop sign to take a right-hand turn onto the former, which would put him into the same lane in which the plaintiff was traveling. Traffic on Outer Hammond Street has the right of way at that intersection. White saw the motorcycle when the plaintiff was roughly one quarter mile from the intersection. There were no obstructions to interfere with the ability of the operators to see each other.

After White saw the plaintiff approaching the Hildreth Street intersection, he believed that he had enough time to turn onto Outer Hammond Street, and he therefore entered the intersection. Because of the length of the trailer he was hauling, White needed to make a wide turn to avoid clipping the curbing on the corner and the stop sign itself. The best evidence regarding the quality of White's decision to proceed, despite the plaintiff's approach toward that intersection, is found in the plaintiff's assessment that had the truck continued into the intersection, he (the plaintiff) would have had to engage in a hard deceleration which, although short of a panic stop, would have required use of both brakes and possible led to skidding. In anticipation of the need to evade the truck, the plaintiff changed his path of travel from the outside of the lane (where the passenger side tires of a car or truck would ride) to the inside of the lane (where the driver's side tires would ride).

When the cab of the tractor-trailer was more than half way across the lane that the plaintiff was using, the truck stalled. At that point in the maneuver, the cab was at an angle approaching 45 degrees. White then took steps to restart the truck. During the several seconds it took to complete that process and resume forward motion, he did not observe the plaintiff's motorcycle, which he knew was still approaching the intersection. The defendant argues that White was unable to see back toward the plaintiff's location

2

because of the position of the truck and its rear-view mirrors, and the configuration of the driver's seat inside the cab. However, the fact remains that White knew that the plaintiff was heading toward the Hildreth Street intersection and that the cab of the truck was blocking most (but not all) of that inbound lane that the plaintiff was using. Under these circumstances, White acted negligently by blindly continuing his entry into the intersection after he had restarted the truck, without accounting for the plaintiff's situation. Presumably, he did not expect to stall the truck as he entered Outer Hammond Street, and there is no evidence that the engine stalled as a result of careless or faulty driving. However, even when the engine quit, White was in a position to assess his situation and that of nearby motorists, including the plaintiff. If his mirror view back toward where he had seen the plaintiff was within a blind spot, then he knew or should have known that he did not have an adequate view of an important part of his surroundings. With a bit of maneuvering inside of the cab, White could have quickly assessed traffic conditions and, with that knowledge, acquired better information to inform his decision of how to proceed from there. Unfortunately, he failed to take those available steps. If nothing else, a reasonable person in White's situation would know or should have known that the because the stalled cab was not fully blocking the plaintiff's lane of travel, if White was unable to account for the plaintiff, it would be more reasonable and prudent to remain stationary rather than to proceed further into the intersection and completely impede the plaintiff's path of travel.

The court assigns no fault to the plaintiff. There is no persuasive evidence that he was speeding or inattentive to his circumstances. When he saw the defendant's truck enter into his path of travel, he took appropriate action: he slowed down by easing up on the throttle, and he moved to the inside of the travel lane to be in a better position to avoid a collision with the truck. It was utterly reasonable for him to conclude, when the truck stalled in the roadway, that the truck was actually stopping to yield to his right of way. Indeed, a witness who was directly behind the truck reached the same conclusion as did the plaintiff. It is not an uncommon experience for a motorist to begin entry into an intersection and then either observe another vehicle that he had not seen initially, or reassess the speed of an oncoming vehicle. In those instances, that driver will stop and wait for that traffic to clear the immediate area. Because White's initial entry into the

3

intersection was going to interfere with the plaintiff's progress, it would reasonably appear that the sudden stop of the truck manifested a realization by the truck driver that he needed to let the plaintiff pass by before proceeding any further. The plaintiff continued to decelerate but chose to continue driving (instead of engaging in a very hard stop, which seemed to become unnecessary because it appeared that the truck was stopping in deference to him). This course of action was reasonable in light of the circumstances that were apparent to the plaintiff, see Hargrove v. McGinley, 2001 ME 36, ¶ 6, 766 A.2d 587, 589-90 (emergency doctrine), and it was not an instance when the plaintiff simply enforced his right of way at the expense of a collision, see State v. Marshall, 451 A.2d 633, 635 (Me. 1982).

At the time of impact, both vehicles were moving slowly. The plaintiff's slow speed at that moment is further evidence that he was proceeding with due care, because it shows the extent to which he had slowed down in the face of the truck's incursion into the intersection. The extreme left (driver's) side of the front of the truck's bumper hit the rear right side of the motorcycle (to the rear of the plaintiff's right leg). Thus, the truck was moving at the moment of impact. The responding officer noted that the corner of the cab was at or just short of the center line on Outer Hammond Street. He also testified that the truck had not been moved prior to his arrival at the scene. This demonstrates that in fact prior to impact, the plaintiff still had some room to get by the truck and that it was reasonable for him, under these unexpected circumstances, to proceed in that way.

The impact knocked the plaintiff and the motorcycle to the ground. He sustained a badly fractured ankle as a result. He also argues that his use of crutches necessitated by the ankle injury activated symptoms of an underlying degenerative neurological condition. The court addresses these issues separately because they are discrete.

As a result of the accident, the plaintiff fractured his left ankle and fibula. He underwent surgery that day and was discharged from the hospital the next. At his house, a bedroom was set up for him on the main floor to minimize his activity, and he was largely confined to bed. He was instructed not to place any weight on that leg. Of course, he was not able to work. Several weeks after the accident, he reported to his orthopaedist, Dr. Lawsing, that the injury "feels pretty good." However, by early November, Dr. Lawsing had concluded that the plaintiff's foot had not remained aligned

4

and needed the additional support. Consequently, Dr. Lawsing performed a second procedure on the plaintiff to substitute a plate for a rod that he had originally secured to the fibula. The timing of this development was significant because the plaintiff is an oil burner technician and winter is his busy season. Because he was incapacitated during the winter of 2001-02, the loss of income was greater than it would have been at other times of the year. The setback in November also made it impossible for him to care for his own home and that of his mother, whom he frequently assisted, that winter season. Despite the limitations on his physical activity, however, by mid-November the plaintiff reported to Dr. Lawsing that his ankle and leg were "feeling good," and a month later his ankle was asymptomatic. In January, the plaintiff had a third surgery (outpatient) to remove some hardware from his leg.

The plaintiff continued to progress through winter and spring of 2001-02. By May, Dr. Lawsing cleared him to return to work. However, the plaintiff was instructed not to engage in strenuous activity; specifically, he was warned not to lift more than 10 pounds so that he would not put too much pressure on his ankle. This restriction, which continues to the present and will continue indefinitely, is particularly problematic because the plaintiff's job used to require him to carry heavy equipment. He cannot do that now, and although he remains employed, his duties have been reduced to more mundane work of lesser responsibility. Thus, this is a situation where the plaintiff's injuries to his ankle and leg are permanent and are manifested more in a significant limitation in his movement and activities than in ongoing pain, which, although present, does not appear to be wholly debilitating.

His special damages generated from this injury are medical expenses of $26,000 and lost wages of $19,400. The plaintiff's claim for lost income covers the period of approximately eight months between the date of the accident through the date he actually returned to work, namely, May 6, 2002. However, Dr. Lawsing cleared the plaintiff to return to work on February 26, 2002. Despite this medical assessment, one month later, Dr. Lawsing noted that "[h]e is not able to get back to work yet." Nonetheless, from the present record, the court cannot find that the loss of wages resulting from the accident continued beyond February. The plaintiff's weekly income was $808, and the duration of

lost wages attributable to his ankle and leg injury was roughly 24 weeks. This amounts to $19,400.

After the accident, the plaintiff used crutches to help allow the bone fractures to heal. He noted some increasing neck pain with tingling and loss of sensation radiating into his right arm. The plaintiff reported that problem to Dr. Lawsing in 2001. After several physicians made unsuccessful conservative efforts to treat that issue (including physical therapy and treatment from a specialist in pain management), the plaintiff was referred to a neurosurgeon, Dr. Weitman. Dr. Weitman diagnosed a herniated disc at C5-6, associated with degeneration not caused by the accident at issue here. Ultimately, in December 2002, Dr. Weitman performed a cervical discectomy, removing the offending disc. That procedure gave the plaintiff nearly immediate relief, and he now has little or no problem with his neck or arm. As a result of the surgery, the plaintiff missed roughly five weeks of work before returning to light duty. The question here is whether the accident aggravated the preexisting neurological condition, making it symptomatic and rendering the defendant liable for resulting damages.

The plaintiff testified that he noticed the neck and arm problems while he was using crutches. He reported this development to Dr. Lawsing in December 2001, while Dr. Lawsing continued to provide care for the orthopaedic issues. Dr. Lawsing found that the plaintiff's range of neck motion was limited and that x-rays revealed disc space narrowing. Dr. Lawsing concluded at that time that the underlying condition preexisted the accident but was aggravated by the use of crutches. *See* Lawsing deposition transcript at pp. 13-14. Eventually, the plaintiff's primary care physician referred him to Dr. Weitman. He was first examined by Dr. Weitman in September 2002. Dr. Weitman concluded that the plaintiff's cervical condition "was exacerbated by his prolonged use of crutches." Plaintiff's exhibit 7.

The defendant argues that the plaintiff's symptomatology is similar to a flare-up he experienced several years prior to the accident and that its post-accident onset coincided with the time the plaintiff returned to work and became more active. The defendant also notes that the absence of any findings of neck pathology until well after the accident serve to distinguish it causally from that event. On those bases, the defendant contends that the pain and tingling is not related to the 2001 accident.

6

The evidence shows, however, that the pain and tingling in the plaintiff's neck and right arm predated the time the plaintiff returned to work and became more active. The plaintiff told Dr. Lawsing of the problem in December 2001 – prior to his return to work and the time he started to exercise more actively. Further, as Dr. Weitman testified, the plaintiff's return to work in May 2002 is not likely to have generated the plaintiff's symptoms, because his work was limited to light duty. In contrast, prior to the accident, the plaintiff's work involved hard physical labor, and his neurological symptoms were limited to one event and dissipated quickly with conservative treatment.

The defendant also argues that Dr. Lawsing drew a causal connection between the plaintiff's neurological condition and the accident on the basis of a faulty history. The plaintiff had told Dr. Lawsing – incorrectly – that he had no neck problems prior to the accident. Despite the fact that the plaintiff in fact had a prior neck injury that resulted in some similar symptoms, this does not undermine the physicians' opinions on causation of symptoms. Although Dr. Lawsing was not provided with an accurate history, he knew when he formed his causation opinion that the plaintiff had a preexisting degenerative condition, because it was revealed by the x-rays. *See* Dr. Lawsing deposition transcript at p. 31. Perhaps more importantly, the plaintiff's neurological condition was treated primarily by Dr. Weitman, the neurosurgeon, who was aware of the prior injury.

Further, although Dr. Lawsing and Dr. Burger did not make any notes regarding the plaintiff's neck problem during a number of visits, this fact loses significance because during the time when the plaintiff was treating with Dr. Lawsing, he (the plaintiff) was actively engaged with other physicians for the neck problem. For example, Dr. Lawsing saw the plaintiff on October 31, 2002, but made no note of any neck problem. However, two days earlier, the plaintiff was examined by a pain specialist, Dr. Zolper, for his neck. For better or worse, the plaintiff appears to have compartmentalized his treatment, telling Dr. Lawsing, for example, that other doctors were providing care for his neck. *See* Dr. Lawsing deposition transcript at pp. 28-29. From this evidence, it is clear that the absence of any reference to the plaintiff's neurological condition in one provider's records is not instructive on all aspects of the plaintiff's condition, because virtually simultaneously, the plaintiff was receiving treatment for that condition from others.

Based on the evidence, the court finds that the best explanation for the plaintiff's back and neck pain has been provided by the two treating specialists: that the plaintiff had a preexisting neurological condition, that the plaintiff's extended use of crutches during the time he was instructed not to place weight on his injured leg aggravated that preexisting condition and that as a result he became symptomatic. The court finds that the preexisting condition made the plaintiff more vulnerable than other people to developing the neurological complication that arose here. The defendant is liable for that loss.[2]

During the period of post-surgery rehabilitation, the plaintiff lost income of $4,450 and incurred medical expenses of $24,400.

In considering the plaintiff's damage claim, the court finds that most significant consequences of his orthopaedic injuries are the substantial limitations they have imposed on the nature and level of his physical activities, both at work and in his personal life. Because he is restricted from lifting objects of any real weight, he no longer can engage in the type of jobs that he found to be fulfilling. He also lost a supervisory position that he had started shortly prior to the accident. Outside of work, the plaintiff had been active. Now, his capacity to perform such basic tasks as carry groceries or mow the lawn is limited, and the recreational activities he once enjoyed are not as prominent in his life. In this context, however, it is worthy of note that prior to the accident, the plaintiff had regular contact with his primary care physician for soreness and aches in joints and other body parts. *See generally* defendant's exhibit 23. The court infers that if these problems were worthy of medical attention, they must have inhibited his activity to some extent. The plaintiff is 52 years old.

The plaintiff's neurological condition has resolved as a result of the December 2002 surgery. His special damages associated with that part of his damage case are significant, but his general damage are more limited because the symptoms were of

---

[2] The court views this as a "fragile condition" analysis and not one governed by *Lovely v. Allstate Ins. Co.*, 658 A.2d 1091 (Me. 1995). *Lovely* is applicable in instances of an aggregate injury. *Id.* at 1092. Here, the plaintiff sustained a single injury, namely the neck and arm problem. The injury occurred when medical treatment provided to the plaintiff made an underlying condition symptomatic. Because the court is not called to apportion or make an allocation between several separate injuries, the *Lovely* analysis is inapposite.

limited duration, although they were significant enough to prompt him to choose surgical intervention.

The plaintiff's cumulative special damages are $74,250.

The court awards the plaintiff compensatory damages in the total amount of $225,000.

The entry shall be:

For the foregoing reasons, judgment is entered for the plaintiff in the amount of $225,000, plus interest and costs of court.

Dated: July 15, 2003

Justice, Maine Superior Court
Jeffrey L. Hjelm

9

ROBERT WINSLOW  - PLAINTIFF

Attorney for: ROBERT WINSLOW
DANIEL KAGAN
BERMAN & SIMMONS
PO BOX 961
129 LISBON STREET
LEWISTON ME 04243-0961


vs
HARTT TRANSPORTATION SYSTEMS INC - DEFENDANT

Attorney for: HARTT TRANSPORTATION SYSTEMS INC
JAMES M BOWIE
THOMPSON & BOWIE
THREE CANAL PLAZA
PO BOX 4630
PORTLAND ME 04112-4630

SUPERIOR COURT
PENOBSCOT, ss.
Docket No   BANSC-CV-2001-00203


**DOCKET RECORD**

Filing Document: COMPLAINT                    Minor Case Type: AUTO NEGLIGENCE
Filing Date: 10/18/2001

## Docket Events:

05/10/2002 FILING DOCUMENT - COMPLAINT FILED ON 10/18/2001

        NOTE - PRIOR ENTRIES IN MANUAL DOCKET ENTERED ON 10/18/2001

05/10/2002 ATTORNEY - RETAINED ENTERED ON 10/18/2001

05/10/2002 ATTORNEY - RETAINED ENTERED ON 10/30/2001

05/10/2002 ASSIGNMENT - SINGLE JUDGE/JUSTICE ASSIGNED TO JUSTICE ON 11/02/2001
        JEFFREY L HJELM , JUSTICE

07/19/2002 Party(s):  HARTT TRANSPORTATION SYSTEMS INC
        OTHER FILING - WITNESS LIST FILED ON 07/19/2002
        DEFENDANT'S WITNESS LIST

07/19/2002 Party(s):  HARTT TRANSPORTATION SYSTEMS INC
        OTHER FILING - EXHIBIT LIST FILED ON 07/19/2002
        DEFENDANT'S EXHIBIT LIST.

08/02/2002 Party(s):  ROBERT WINSLOW
        OTHER FILING - STATEMENT OF TIME FOR TRIAL FILED ON 08/01/2002
        LENGTH OF TRIAL 2 DAYS AND THE LISTS OF EXHIBITS AND WITNESSES BY LETTER DATED JULY 30,
        2002 BY PLAINTIFF

08/02/2002 Party(s):  ROBERT WINSLOW
        OTHER FILING - WITNESS LIST FILED ON 08/01/2002
        LENGTH OF TRIAL ESTIMATE, WITNESS & EXHIBIT LIST BY LETTER DATED JULY 30, 2002 BY
        PLAINTIFF

08/02/2002 Party(s):  ROBERT WINSLOW
        OTHER FILING - EXHIBIT LIST FILED ON 08/01/2002

STATE OF MAINE                    SUPERIOR COURT
PENOBSCOT, SS.                    CIVIL ACTION
                                 Docket No. CV-01-203

FILED & ENTERED
SUPERIOR COURT

AUG 20 2003

PENOBSCOT COUNTY

Robert C. Winslow,
        Plaintiff

        v.                       Order; Amended Judgment

DONALD L. GARRECHT
LAW LIBRARY

AUG 25 2003

Hartt Transportation Systems, Inc.,
        Defendant

        The court has considered the parties' submissions on the plaintiff's bill of costs. The filings do not provide an explanation for the service and witness fees challenged by the defendant. These expenses are not allowed, and costs of $1,985.40 are therefore awarded to the plaintiff.

        Title 14 M.R.S.A. §§ 1602-B(4) and 1603-C(1)(B)(2), effective July 1, 2003, require that the rates of pre-judgment and post-judgment interest must be stated in the judgment. Therefore, the judgment dated July 15, 2003, is amended to provide that the rate of pre-judgment interest is 2.08% per annum and that the rate of post-judgment interest is 7.08% per annum. In all other respects, the July 15 judgment shall remain in full force and effect.

        The accrual of pre-judgment interest is suspended from November 19, 2002 (the date when the plaintiff "obtained" a continuance of trial), until June 30, 2003 (the date of the trial).

        The clerk shall incorporate this order into the docket by reference.

Dated: August 18, 2003

                                 _____
                                 Justice, Maine Superior Court